UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Harry B. Bundy, Jr.,

        Plaintiff,                                    Civ. No. 12-1436 (RHK/AJB)
                                                             **MEMORANDUM OPINION**
                                                             **AND ORDER**

v.

U.S. Bank National Association,

        Defendant.

---

Eric D. Satre, Jones Satre & Weimer PLLC, Bloomington, Minnesota, for Plaintiff.

Natalie Wyatt-Brown, Halleland Habicht P.A., Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

Plaintiff Harry B. Bundy, Jr., who is African-American, worked for Defendant U.S. Bank National Association ("U.S. Bank") from 2006 to 2009. He alleges in this action that U.S. Bank terminated his employment on account of his race and age, in violation of federal, state, and local law. Presently before the Court is U.S. Bank's Motion for Summary Judgment. For the reasons that follow, its Motion will be granted.

## BACKGROUND

Most of the relevant facts are undisputed, although the dates of several key events are somewhat muddled.[1] U.S. Bank hired Bundy, then 42 years old, in July 2006 as an

---

[1] In his submissions, Bundy inaccurately refers to the dates of certain events. For example, he claims that in "late June of *2013*, [he] was approached" by employees complaining of harassment. (Bundy Decl. ¶ 16 (emphasis added); accord Mem. in Opp'n

"Operations Manager 1" in its Corporate Trust Support Services ("CTSS") department, managing a team of employees in the "Bond of Indemnity/Bondholder Processing group." The parties have not clearly explained Bundy's job duties as head of that group, but the record indicates that his team fielded calls and reviewed correspondence from customers whose U.S. Bank bonds had been destroyed, lost, or stolen. Pursuant to a regulation issued by the United States Securities and Exchange Commission ("SEC"), referred to by the parties as "17f-1," a bank generally must report the loss or destruction of a bond or other security to the SEC within 24 hours of being notified thereof by a customer.[2] During Bundy's tenure, U.S. Bank expected 100% compliance with this regulation, deeming anything below 99.7% compliance unsatisfactory.

When first hired to head the Bond of Indemnity/Bondholder Processing group, Bundy reported to Dan Hill, who oversaw bondholder communications, and Hill, in turn, reported to Jim Nielsen, Senior Vice President in charge of CTSS. Hill praised Bundy's work, and in March 2007, he was promoted to Operations Manager 2 and received a pay raise, though his job duties did not materially change. When Hill resigned a short time later, Bundy began reporting to Sarah Thorstad, who had been hired by Nielsen to manage the CTSS department, including the Bond of Indemnity/Bondholder Processing group and other groups labeled "Call Center, Private Label, and Unclaimed Property and

---

at 7.) But this makes no sense, as his employment with U.S. Bank ended in February *2009*. (See also Bundy Decl. ¶¶ 21, 25 (suggesting certain events transpired in mid-to-late 2009, *after* his termination from U.S. Bank); Mem. in Opp'n at 11-12 (same).) The Court has done its best to decipher, from context, when the relevant events took place.

[2] See 17 C.F.R. § 240.17f-1(c)(1) (a bank "shall report to the [SEC] . . . the discovery of the theft or loss of any securities certificate . . . within one business day").

Advanced Research."[3] Bundy was interested in applying for Hill's position but it was never posted for applications. Instead, he claims that Thorstad, a "younger white employee," was "hand selected" by Nielsen for that job.

According to Bundy, Thorstad repeatedly engaged in discriminatory conduct toward him; he offers several examples. He notes that in January 2008, the manager of the Call Center resigned, and although Bundy expressed interest in that position, Thorstad hired a younger white male, Scott Missman.[4] Missman had previously worked for U.S. Bank as head of the Bond of Indemnity/Bondholder Processing group (Bundy's position) and, in that role, had worked with Thorstad, with whom he had a "personal friendship." A written review from Missman's prior tenure indicated that his performance had been below average in several areas, but Thorstad nevertheless hired him, which Bundy labels discrimination. Missman's prior review also indicated that he was held to something less than a 100% standard for 17f-1 compliance during his time as head of the Bond of Indemnity/Bondholder Processing group.

Bundy further avers that, after Missman was hired, several female employees complained to him that Missman was making sexually inappropriate comments in the workplace. Bundy relayed those complaints to Thorstad, after which he alleges he was "targeted" by both Thorstad and Missman, including being denied the opportunity to work from home on occasion even though Missman was permitted to do so. In addition,

---

[3] The parties have not explained the functions of these groups.

[4] Bundy claims that this position, too, was never posted, although Missman testified in his deposition that he applied for the position through U.S. Bank's online job-posting service.

Bundy discovered that *he* was being investigated for sexual harassment, although that charge ultimately was not substantiated and he was not disciplined.

According to Bundy, the sexual-harassment investigation was "the last straw," and he felt he had to "try to stop the discriminatory treatment going on with the white employees clearly favoring their white friends and hand selecting them to positions." Hence, in October 2008, he complained to U.S. Bank's human-resources (HR) department, which undertook an investigation that included speaking with Nielsen. According to Bundy, Nielsen falsely informed HR that Hill had expressed concerns, before his resignation, about Bundy's performance. Bundy further avers that Nielsen made these (and other) false statements to HR in order "to justify his discriminatory practices," apparently referring to Nielsen hiring Thorstad without posting the position.[5]

Bundy alleges that discrimination and retaliation escalated following his complaint to HR. He asserts that shortly after his complaints, Nielsen convened a meeting with Thorstad and HR representatives in which he (Nielsen) wrongly reported that Bundy had performance issues and should be placed on an "action plan" to address them. He also claims that Thorstad began "papering his file," falsely asserting that his 17f-1 compliance was below expectations.

In December 2008, the CTSS department was restructured in the wake of Thorstad's resignation. Bundy's group was placed under the supervision of Tom Campbell, head of Payments, while Missman's group fell under Nielsen's direct

---

[5] Nielsen acknowledged that filling positions without posting them violated U.S. Bank policies, and this practice was discontinued following his meeting with HR.

supervision as he debated whether to fill Thorstad's position.  The restructuring resulted in Missman gaining several employees under his command while the number of Bundy's direct reports dropped significantly, which he labels "a transparent attempt to retaliate against" him.  As a result, Bundy once again complained to HR, asserting among other things that (1) the restructuring was in retaliation for his prior complaints, (2) Thorstad had been trying to "usurp" his work by moving certain tasks to Missman, and (3) his job was being unfairly put in jeopardy by U.S. Bank's "unreasonable" 17f-1 performance standard, to which Missman was not subject when he held the same position.  He also informed Campbell that he had raised these concerns with HR.[6]

In January 2009, U.S. Bank reported a significant drop in earnings for the fourth quarter of 2008.  Each of the bank's business lines then began planning for cost-cutting measures.  Nielsen asked the head of each CTSS group, including Campbell, for recommended budget cuts, and Campbell determined that the Payments department could eliminate a management position based on workload, staffing, and the ability to allocate job functions to other managers.  He identified two possible groups for such an elimination:  Specialized Finance, headed by Dan Strantz, and Bond of Indemnity/ Bondholder Processing, headed by Bundy.  Campbell then performed a "Peer Group Analysis," comparing Strantz's and Bundy's performance in categories including qualifications, experience, abilities, and strengths, assigning numerical scores in each category.  Bundy received a significantly lower overall score on this analysis and,

---

[6] Campbell denies learning of Bundy's complaints until his employment ended, but for present purposes the Court accepts Bundy's assertion that he informed Campbell of them in December 2008.

according to Campbell, he therefore selected Bundy for termination; Nielsen approved. Bundy's last day at U.S. Bank was February 19, 2009.

After exhausting administrative remedies, Bundy commenced this action against U.S. Bank in May 2012.[7] His Third Amended Complaint alleges that U.S. Bank engaged in race and age discrimination and retaliation in violation of various federal, state, and city laws.[8] With discovery complete, U.S. Bank now moves for summary judgment. The Motion has been fully briefed and is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[9] Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir.

---

[7] Bundy filed a discrimination charge with the St. Paul Department of Human Rights and Equal Economic Opportunity in April 2009. For reasons undisclosed by the record, the charge was not resolved until December 2011. Due to this delay, however, U.S. Bank argues that certain of Bundy's claims must be dismissed. (See Def. Mem. at 12-15.) Because the Court rejects Bundy's claims on the merits, it need not address that assertion.

[8] Namely, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.01 *et seq.*; and the St. Paul Civil Rights Ordinance ("SPCRO"), St. Paul, Minn. Code § 183.01 *et seq.*

[9] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should

2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

### I.   The discrimination claims

Bundy's Third Amended Complaint alleges race and age discrimination based on his (purported) disparate treatment by U.S. Bank *and* based on the termination of his employment. Bundy's Memorandum, however, narrows these claims – although he contends "not being permitted to apply for positions and being singled out for reduction of his group" constitute discrimination, he avers that his "primary discrimination claim is his termination claim" (Mem. in Opp'n at 28), which is all that he addresses in his Memorandum. Accordingly, the Court follows his lead and assumes that only discrimination claims arising out of the termination of his employment remain for resolution.[10] For the reasons that follow, those claims do not pass muster.

---

be sparingly granted in discrimination cases. Because this Court has cited these cases for different legal principles that remain good law, it has not indicated such abrogation.

[10] That said, claims based on "not being permitted to apply for positions and being singled out for reduction of his group" would fail. (See infra note 11.)

### A. The prima facie case

In the absence of direct evidence of discrimination, which is nowhere suggested here, Bundy's claims are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Holmes v. Trinity Health, __ F.3d __, 2013 WL 4733890, at *2 (8th Cir. Sept. 4, 2013) ("In both ADEA and Title VII discrimination cases, the claimant may either offer direct evidence of the discrimination or satisfy the burden-shifting scheme established by McDonnell Douglas."); Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 520-21 (8th Cir. 2010) (McDonnell Douglas applies to claims under § 1981); Hunter v. United Parcel Serv., Inc., 697 F.3d 697, 702 (8th Cir. 2012) ("The Minnesota Supreme Court has adopted [McDonnell Douglas] to analyze MHRA claims where, as here, the claimant relies on indirect evidence of discrimination."); Fisher Nut Co. v. Lewis *ex rel.* Garcia, 320 N.W.2d 731, 734 (Minn. 1982) (SPCRO claims governed by McDonnell Douglas). Under this framework, "once the plaintiff employee establishes a prima facie case of discrimination, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant offers such a reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 914 (8th Cir. 2007) (citations omitted).

Here, the Court harbors serious doubts whether Bundy has established a prima facie case of either race or age discrimination in connection with his termination. One element of the prima facie case requires Bundy to show that "the circumstances

[surrounding his termination] give rise to an inference of discrimination." Muor v. U.S. Bank Nat'l Ass'n, 716 F.3d 1072, 1076 (8th Cir. 2013). But regarding race, Bundy overlooks that he was not the only employee terminated at the time he lost his job; Bonnie Hoberg, who is white, also had her position eliminated in the Bond of Indemnity/Bondholder Processing group when U.S. Bank implemented cost-cutting measures. Similarly, the record reflects that employees older than Bundy in the Bond of Indemnity/Bondholder Processing group were *not* terminated at the time U.S. Bank laid him off. Given these facts, it does not appear that Bundy has established a prima facie case. See Guimaraes v. SuperValu, Inc., 674 F.3d 962, 974 (8th Cir. 2012) (fourth element of prima facie case satisfied with evidence of "more-favorable treatment of similarly-situated employees who are not in the protected class"); Fowler v. Visiting Nurse Serv. of N.Y., No. 06 Civ. 4351, 2007 WL 3256129, at *5 (S.D.N.Y. Oct. 31, 2007) (no inference of discrimination where persons inside and outside the protected class were treated similarly).[11]

---

[11] Another element of the prima facie case is that Bundy suffered an adverse employment action. E.g., Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011); Wells v. SCI Mgmt., L.P., 469 F.3d 697, 700 (8th Cir. 2006). It is for this reason that a claim based on "being singled out for reduction of his group" cannot stand. An adverse employment action is one that "produces a material employment disadvantage." Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 789 (8th Cir. 2007). While actions short of demotion or a cut in pay may suffice, "[m]inor changes in duties or working conditions," even those which are "unpalatable or unwelcome [but] which cause no materially significant disadvantage," will not do. Id. Here, there is no evidence that Bundy's title, duties, or responsibilities changed in any manner due to the loss of subordinates. Standing alone, therefore, this is not an adverse employment action. See, e.g., Hughes v. Stottlemyre, 454 F.3d 791, 797 (8th Cir. 2006) (plaintiff failed to show that an "exchange of her staff, while her salary, benefits, responsibilities, title and even office location remained the same," was materially adverse); Taylor v. Va. Dep't of Corr., 177 F. Supp. 2d 497, 504

Despite its doubts, however, the Court will assume *arguendo* that Bundy has established a prima facie case of race and age discrimination based on the termination of his employment.  U.S. Bank has offered a legitimate, nondiscriminatory reason for the termination:  cost-cutting necessary due to the bank's poor 2008 financial performance, and Bundy's lower score on the Peer Group Analysis when Campbell decided which manager to eliminate.  The burden, therefore, rests with Bundy to proffer sufficient evidence to create a jury question that this is a pretext for discrimination.

### B.     Pretext

"When an employer articulates a nondiscriminatory reason for an [employment action], the factual inquiry proceeds to a new level of specificity."  Gibson v. Am. Greetings Corp., 670 F.3d 844, 856 (8th Cir. 2012) (alteration in original) (citation omitted).  To avoid summary judgment, Bundy must come forward with evidence both calling into doubt U.S. Bank's proffered reason *and* creating a genuine issue that discrimination was the real reason for his termination.  Id.; Haigh v. Gelita USA, Inc., 632 F.3d 464, 470 (8th Cir. 2011) ("[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee.  A plaintiff must also demonstrate that the

---

(E.D. Va. 2001) (plaintiff's transfer to smaller facility and the "corresponding reduction in . . . the number of subordinates he was to supervise" was "hardly sufficient to constitute adverse action").  Bundy also cannot state a prima facie case with regard to "not being permitted to apply for positions."  He claims the reason he could not apply for certain positions was that they were not posted, but this means *every interested applicant* was denied the chance to apply, not just Bundy.  Hence, he cannot show the circumstances "give rise to an inference of discrimination" based on race or age.  Muor, 716 F.3d at 1076.

circumstances permit a reasonable inference of discriminatory animus."").  He cannot overcome this hurdle here.

Bundy first challenges U.S. Bank's proffered reason, arguing the Peer Group Analysis was "false" because it was conducted *before* Campbell was informed of the need for cost-cutting.  He notes that the Analysis is dated January 28, 2009, but Campbell (ostensibly) learned of the need to reduce costs only when he received a February 5, 2009 e-mail from U.S. Bank's CEO, providing guidance on the cost-cutting measures to be undertaken.  (Mem. in Opp'n at 28-29.)  This argument, however, misconstrues the record.  While the bank's cost-reduction plan was not *implemented* until February 5, Campbell testified in his deposition that the bank had been "contingency planning" for cost reductions of 5-10% from the end of 2008.  (Campbell Dep. at 14-18.)  The evidence simply does not support the argument that Campbell only learned of the need to cut costs for the first time on February 5, or that the Peer Group Analysis "was conducted before [he] was even notified [about the need for] cuts."  (Mem. in Opp'n at 29.)

Bundy next argues that U.S. Bank has offered shifting explanations for his termination.  "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext," Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 855 (8th Cir. 2005), but Bundy has not shown that U.S. Bank's reasons shifted here.  In support of his argument, Bundy asserts he was told the decision to end his employment "had been based on staffing levels, volume levels, ability to absorb the work, and ability to manage risk."  (Bundy Decl. ¶ 56.)  He claims U.S. Bank has now "changed" its explanation because these items "are nowhere [mentioned] in the [P]eer [G]roup

[A]nalysis." (Id. ¶ 63.) Yet, Bundy ignores that the Peer Group Analysis was the *second* step in the decision to terminate his employment, used by Campbell to decide *which* manager (Bundy or Strantz) should be laid off. Campbell *first* had to decide whether a manager should be eliminated, and as set forth above, in making that decision he considered workload, staffing, and the ability to allocate job functions to other managers – the factors Bundy now claims have "changed."

Bundy next argues that U.S. Bank did not follow its own policies when it terminated his employment. He claims that Campbell violated a directive contained in the February 5 e-mail from U.S. Bank's CEO to reduce non-personnel expenses before considering layoffs. Yet again, this argument misconstrues the record. It is undisputed that Campbell reduced contract labor costs and overtime, restricted merit increases, and "closed" a bond-operations position following an employee's retirement. Bundy offers no evidence that there were other costs that could have, or should have, been eliminated before Campbell decided to proceed with layoffs. In fact, the February 5 e-mail recognized that cost-cutting alone would not suffice and that layoffs likely were necessary. (See Wyatt-Brown Decl. Ex. K at 10 ("[L]imit[ing] unnecessary travel, meetings, subscriptions, and other costs . . . will NOT accomplish this entire [cost-cutting] task, [and] therefore the remainder of the steps will include personnel" actions) (emphasis in original).)[12]

---

[12] Bundy also argues that U.S. Bank violated its policies because "no one ever reported back to [him] about his discrimination and retaliation complaints." (Mem. in Opp'n at 32.) Even if true, the Court fails to see how this changes the calculus. Bundy does *not* aver that U.S. Bank failed to look into his complaints, and the record reveals that the

Furthermore, Bundy overlooks that the February 5 e-mail provided only *guidance* to each operating group as to how to cut costs. Nothing suggests that e-mail *mandated* how expenses were to be reduced – and its text indicates just the opposite. (See id. ("[T]he overall goal for the entire bank is to reduce operating expenses by 5% for the entire year. *Instead of prescribing a specific set of actions to accomplish this task, each area of the bank will be permitted to accomplish this task in the most appropriate manner for their group.*") (emphasis added).) And Bundy has pointed to no evidence suggesting that Campbell (or anyone else) understood the e-mail as *directing* how cost savings were to be accomplished.

Bundy further argues that when undertaking the Peer Group Analysis, Campbell should not have compared him with Strantz, who "was in no way [his] peer," but rather with Missman, whose "rating was far inferior" and who was "in the midst of very serious sexual harassment allegations which resulted in both a verbal and a written warning." (Mem. in Opp'n at 23.) Yet, it is "not the role of this court to sit as a super-personnel department" and "second guess the wisdom of" the Peer Group Analysis. Evers v. Alliant Techsystems, Inc., 241 F.3d 948, 957 (8th Cir. 2001) (internal quotation marks omitted). Moreover, there is a simple explanation why Campbell compared Bundy to Strantz and not Missman: *Campbell was not Missman's supervisor.* As set forth above, Bundy began reporting to Campbell after Thorstad resigned, while Missman began reporting directly to Nielsen (Campbell's boss). See Floyd-Gimon v. Univ. of Ark. for

---

company in fact did so. Rather, Bundy contends only that he did not *learn the outcome* of those investigations. Hence, it is unclear what impact this "failure" had.

- 13 -

Med. Sci., 716 F.3d 1141, 1150 (8th Cir. 2013) (comparator evidence probative only when "[t]he individuals used for comparison . . . have dealt with the same supervisor").[13]

To be sure, the Peer Group Analysis is not entirely immune from challenge. Many of the criteria contained therein were subjective, see Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1080 (8th Cir. 2008) (cautioning that subjective criteria deserve careful scrutiny because they are "easily fabricated"), and the poor scores Bundy received do not dovetail neatly with his last annual performance review, which indicated that he was "consistently [meeting] and at times exceed[ing] expectation[s]" (Bundy Decl. Ex. A). But Bundy has offered little to suggest that Campbell did not *believe* the "deficiencies" noted in the Analysis. Campbell supervised Bundy for only a short period of time before deciding to terminate his employment, and in that time he counseled Bundy on several occasions concerning his performance. (See Bundy Dep. Ex. 20.) Furthermore, Campbell did not conduct Bundy's prior annual review, and nothing in the record suggests he was aware of what it contained. The "critical inquiry" is not whether Bundy *actually* was a poor performer, but rather whether Campbell in good faith *believed* that to be true. Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1002-03 (8th Cir. 2012) ("[E]ven if the [employer's action] was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist.") (citation omitted); accord, e.g., Evance v. Trumann Health Servs., LLC, 719 F.3d 673, 678 (8th Cir. 2013) ("[I]t is not unlawful for

---

[13] In any event, a comparison to Missman rather than Strantz may not have made a difference. Missman's 2008 annual review contained higher scores than Bundy's and indicated that he "consistently exceeded expectations." (Bundy Dep. Ex. 6.)

a company to make employment decisions based upon erroneous information and evaluations.") (citation omitted). Bundy has not proffered sufficient evidence to undermine that conclusion here.

All told, the record fails to create a genuine issue whether U.S. Bank's proffered reason for Bundy's termination was pretextual. Accordingly, the bank is entitled to summary judgment on his discrimination claims.[14]

## II.     The retaliation claims

Bundy's retaliation claims – which are also analyzed under the McDonnell Douglas framework, see Muor, 716 F.3d at 1076; Guimaraes, 674 F.3d at 978 – are broader than his discrimination claims. In addition to claiming that his *termination* was retaliatory, he also labels as retaliation (1) Thorstad "funnel[ing] his work to Missman," (2) Nielsen and Thorstad "papering" his file and conspiring to put him on an action plan, and (3) the loss of "a great deal of his direct reports" after the CTSS restructuring. (Mem. in Opp'n at 33.) None of these claims survives summary judgment.

First, besides termination, all of the conduct Bundy challenges is not actionable. Because retaliation laws are designed to "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006), a plaintiff must establish that he "suffered a materially adverse employment action" in order to avoid summary judgment. Jackman v. Fifth

---

[14] Although the St. Paul Department of Human Rights and Equal Economic Opportunity found probable cause to believe U.S. Bank had discriminated against Bundy, the Court is not bound by that determination. See, e.g., Schwarzkopf v. Brunswick Corp., 833 F. Supp. 2d 1106, 1126 n.17 (D. Minn. 2011) (Kyle, J.) (citing Kremer v. Chem. Constr. Corp., 456 U.S. 461, 477 (1982)).

Judicial Dist. Dep't of Corr. Servs., __ F.3d __, 2013 WL 4529461, at *2 (8th Cir. Aug. 28, 2013). Simply put, "trivial harms . . . do not rise to the level of retaliation." Recio v. Creighton Univ., 521 F.3d 934, 940 (8th Cir. 2008). And under Eighth Circuit law, shunting work to others, having an employment file "papered," being placed on an action plan, and losing subordinates are not materially adverse employment actions in the absence of evidence that Bundy suffered negative consequences (such as lost opportunities for promotion or pay increases) as a result. See, e.g., Hill v. City of Pine Bluff, Ark., 696 F.3d 709, 715 (8th Cir. 2012) ("[S]ending a critical letter that threatened appropriate disciplinary action, or falsely reporting poor performance . . . [a]re actions that d[o] not establish a prima facie case of retaliation, absent showings of materially adverse consequences to the employee."); Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 929 (8th Cir. 2007) (finding none of the following materially adverse: "failure to provide training and orientation, denying . . . access to needed employment tools, failure to reinstate [plaintiff] to her prior position, interfering with her authority, unfairly adding negative reports and reprimands to her personnel file, treating her differently than her coworkers, excluding her from meetings, giving her a negative evaluation, . . . and adding days to a training assignment at a different unit"); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785-87 (8th Cir. 2007) (no retaliation claim despite plaintiff (1) being unfairly disciplined, (2) losing out on pay guarantees given to others, (3) having co-workers interfere with the performance of her job, (4) being denied employment tools, and (5) having her complaints not fairly considered).[15]

---

[15] Conduct insufficiently adverse when viewed *individually* might pass muster when

This leaves for discussion only Bundy's termination, which was indisputably a materially adverse employment action for purposes of his retaliation claims. But as previously noted, U.S. Bank has proffered a legitimate, non-retaliatory reason for that termination, and to show pretext Bundy offers the same evidence already discussed above. Accordingly, he has failed to create a jury issue on his retaliation claims. See Wierman v. Casey's Gen. Stores, 638 F.3d 984, 1001 (8th Cir. 2011) (retaliation claim arising out of plaintiff's termination failed for "the same reasons her . . . discrimination case failed – a lack of sufficient evidence to cast doubt on [the proffered] reason for terminating [her]").

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that U.S. Bank's Motion for Summary Judgment (Doc. No. 29) is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: September 17, 2013                    s/Richard H. Kyle
                                            RICHARD H. KYLE
                                            United States District Judge

---

viewed *cumulatively* or as a *pattern*. See Devin, 491 F.3d at 787. But this is true only "where an employer engages in extreme, systemic retaliatory conduct resulting in serious employment consequences." Id. at 788. The Court finds the challenged conduct here was neither "extreme" nor caused "serious employment consequences." See id.